IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TAPP MFG, INC.,                    )
                                   )
          Plaintiff,               )
                                   )
     v.                            )          1:24-CV-944
                                   )
SPEED UTV, LLC,                    )
                                   )
          Defendant.               )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Before this court is Plaintiff Tapp MFG, Inc.'s Motion for Preliminary Injunction, (Doc. 8). For the reasons stated herein, Plaintiff's motion will be granted.

## I.    FACTUAL BACKGROUND

This case arises from a failed business relationship between Plaintiff Tapp MFG, Inc. ("Tapp") and Defendant Speed UTV, LLC ("Speed"). Tapp is a Canadian corporation that provides "components to the automotive industry, including clutches and accessories." (Compl. (Doc. 1) ¶¶ 2-4.) Tapp was founded by David Forsyth, who continues to serve as the company's CEO. (Id. ¶ 46.) Speed is a Delaware LLC with headquarters in North Carolina that manufactures and sells offroad, utility terrain vehicles ("UTVs"). (Id. ¶¶ 5-6, 42; Def.'s Answer & Countercls. ("Answer") (Doc. 15) ¶¶ 5-6, 42.) Robby Gordon ("Gordon") is the

founder and CEO of Speed. (Compl. (Doc. 1) ¶ 48; Answer (Doc. 15) ¶ 48.)

In October 2020, representatives of Tapp and Speed met in Anaheim, California to discuss the possible use of a Tapp-designed clutch prototype in Speed's UTVs. (Compl. (Doc. 1) ¶¶ 30-31; see Answer (Doc. 15) ¶¶ 30, 33.) Following the meeting, the parties "discuss[ed] and negotiate[d] the contours of a possible licensing agreement for [Tapp]'s clutch design." (Compl. (Doc. 1) ¶ 33; Answer (Doc. 15) ¶ 33.) On November 4, 2020, a representative of Tapp emailed Speed a bullet-pointed list of terms. (Ex. 5 (Doc. 1-5) at 2; Compl. (Doc. 1) ¶ 34; see Answer (Doc. 15) ¶ 33-34.)[1] Prefatory language in the email characterized the list as "serv[ing] as an interim and/or supplemental agreement until we have the agreements drafted by our lawyers in place." (Ex. 5 (Doc. 1-5) at 2.) The list of terms in Tapp's email read as follows:

- If the secondary clutch meets or exceeds expectations, Speed UTV will pay TAPP Mfg $60,000US with $30,000US paid immediately by way of wire transfer with the remaining $30,000 to be paid by adding it to the purchase order for the first production.
- Upon receipt of the aforementioned $30,000US wire transfer, Robby Gordon will take possession of the secondary clutch prototype to have it scanned and provide TAPP manufacturing with a copy of that scan.

_____

[1] All citations in this Memorandum Opinion and Order to documents filed with this court refer to page numbers located at the bottom right hand corned of the documents as they appear on CM/ECF.

- 2 -

- Speed will enter into a licensing agreement to pay
  TAPP a royalty amount of 9.5% of production cost on
  each of the primary and secondary clutches with a
  minimum royalty of $15 per unit paid on each secondary
  clutch and a minimum royalty of $30 paid per unit on
  each primary clutch for the Arctic Cat Wildcat XX.
- Both primary and secondary clutches will remain the
  intellectual property of Tapp Mfg and or its
  subsidiary.
- Speed UTV agrees to indemnify Tapp Mfg against any
  and all actions for damages caused by any clutches
  manufactured by Speed UTV.
- Tapp Clutch will work with Mr. Steve Nichols to have
  the agreement ready for signing by the end of today.

(Id.) Gordon responded on the same day, writing on behalf of
Speed: "We agree with the terms listed and look forward to
getting to Production[.] We also discussed a 5 year Agreement
with similar terms on renewal[.]" (Id.)[2] This five-year duration
and renewal term was not among those terms listed in Tapp's
email. (Id.) Tapp's representative replied by thanking Mr.
Gordon and stating that Tapp "look[ed] forward to enjoying a
long and mutually beneficial relationship," however, the reply
did not expressly address or acknowledge the five-year duration
and renewal term raised by Gordon. (Id. at 3.)

Following the November 4 email exchange, the parties'
business relationship progressed. Speed paid Tapp a "Secondary

---

[2] Gordon's response included his electronic signature. (See
Compl. (Doc. 1) ¶ 34; Doc. 1-6; Doc. 1-8.)

Clutch Design Fee Deposit" of $30,000.[3] (See Compl. (Doc. 1)
¶ 37; Ex. 30 (Doc. 1-30) at 2; Answer (Doc. 15) ¶ 37.) Tapp
delivered Speed the clutch prototype. (See Compl. (Doc. 1) at
¶ 37; Ex. 31 (Doc. 1-31).) Speed worked with Tapp to make the
clutch prototype compatible with Speed's UTVs. (Compl. (Doc. 1)
¶ 41; Answer (Doc. 15) ¶ 41.)

     At the same time, the parties continued to negotiate the
terms of an agreement. (See Compl. (Doc. 1) ¶ 38; Answer (Doc.
15) ¶ 38.) Tapp characterizes the parties as "negotiat[ing]
terms of a more robust 'supplemental' agreement that would
supersede" an agreement it believes was formed by the November 4
email exchange. (Compl. (Doc. 1) ¶ 38.) Speed describes the
parties as "exchang[ing] drafts of a formal license agreement"
that would incorporate the terms it believes the parties agreed
upon in the November 4 email exchange. (Answer (Doc. 15) ¶ 38.)
In any event, the parties agree that they exchanged drafts but

_____

[3] The invoice from Tapp to Speed for the "Secondary Clutch
Design Fee Deposit" of $30,000 is dated on October 22, 2020,
with a "due date" of October 22, 2020. (Ex. 30 (Doc. 1-30) at 2;
see Compl. (Doc. 1) ¶ 37.) In other words, the invoice appears
to have been issued, and the payment listed as due, before the
November 4 email exchange. (See Ex. 30 (Doc. 1-30) at 2; Ex. 5
(Doc. 1-5).) Further, because the parties are vague about when
in October 2020 their meeting in Anaheim occurred, (see Compl.
(Doc. 1) ¶ 30 (alleging the meeting occurred "[a]round October
2020); Answer (Doc. 15) ¶ 30 (admitting the meeting occurred "in
or about October 2020")), it is unclear whether Tapp issued this
invoice before or after that meeting, (see Compl. (Doc. 1) ¶ 37;
Ex. 30 (Doc. 1-30) at 2.)

- 4 -

failed to ever agree on an agreement. (See Compl. (Doc. 1) ¶¶ 38-40; Answer (Doc. 15) ¶¶ 38, 40; see also Ex. 33 (Doc. 1-33).)

Speed began manufacturing and importing UTV vehicles in or around September 2023. (Compl. (Doc. 1) ¶ 42; see Ex. 22 (Doc. 1-22) at 4.) Tapp alleges that Speed incorporated Tapp's clutch design into its UTVs, (Compl. (Doc. 1) ¶¶ 43-51), and that Speed also manufactured, imported, and sold the clutches as "stand-alone items," intended to be used as spare or replacement parts, (id. ¶ 43). As of November 2024, when Tapp filed its Complaint, Speed offered for sale on its website at least nine variations of its UTV. (Id. ¶ 42; Answer (Doc. 15) ¶ 42.) According to Tapp, each of these variations used Tapp's clutch design. (Compl. (Doc. 1) ¶¶ 42-43).

Though Speed made periodic payments to Tapp, (id. ¶ 53; see Answer (Doc. 15) ¶ 58), Tapp alleges that Speed failed to perform according to the terms to which Tapp believe they had agreed — that is, Speed failed to manufacture a minimum number of clutches per year or pay Tapp a corresponding minimum payment, (Compl. (Doc. 1) ¶¶ 52-53). According to Tapp, Speed also struggled to deliver its UTVs to customers on time and faced technical issues with its UTVs. (Id. ¶¶ 54, 71, 74.) These

Case 1:24-cv-00944-WO-JLW   Document 29   Filed 01/27/26   Page 5 of 40

problems harmed not only Speed's reputation, but Tapp's, through "guilt by association." (Id. ¶¶ 69-71.)

Tapp alleges that it decided to "take action" in March 2024 because of its fear of sustaining reputational harm, as well as Speed's failure to perform as Tapp expected. (Id. ¶ 55.) On March 6, 2024, Tapp sent Speed a letter demanding a full accounting of all clutches manufactured by Speed and full payment for the amount Tapp believed Speed owed it. (Id. ¶ 56; Ex. 13 (Doc. 1-13); see Answer (Doc. 15) ¶ 56.)[4] After receiving this letter, Speed made payments to Tapp, (Compl. (Doc. 1) ¶ 58; Answer (Doc. 15) ¶¶ 56, 58), though Tapp characterizes these payments as "nominal," (Compl. (Doc. 1) ¶¶ 58-59), and Speed continued to manufacture and sell clutches, (Compl. (Doc. 1) ¶ 63; see Answer (Doc. 15) ¶ 43).

On October 1, 2024, Tapp was issued a patent for its clutch design from an application filed on September 1, 2023. (Compl.

---

[4] Tapp alleges that its March 6, 2024, letter gave Speed "30 days to cure its breach." (Compl. (Doc. 1) ¶ 56.) It further alleges that Speed failed to "take any steps towards curing its breach" within thirty days — by April 6, 2024 — therefore, any license Speed had to use Tapp's clutch design terminated on that date. (Id. ¶ 57.) However, Tapp's letter of March 6, 2024, contains no such explicit language; rather, the letter states, "To avoid further escalation by TAPP, I would ask that you respond to this letter by no later than Friday, March 22." (Ex. 13 (Doc. 1-13) at 3.) The letter also references terms of the draft agreement that the parties failed to agree to. (See id. ("in accordance with Section 6 of the Agreement ('Notice to Parties')"); Compl. (Doc. 1) ¶¶ 40, 56.)

(Doc. 1) ¶¶ 17, 61; Answer (Doc. 15) ¶¶ 17, 61.) David Forsyth, Tapp's founder and CEO, is listed as the sole inventor. (Ex. 1 (Doc. 1-1) at 2.) Speed was aware of the application for the '695 Patent. (Compl. (Doc. 1) ¶ 62; Answer (Doc. 15) ¶ 62.) Tapp alleges that Speed also knew of the issuance of the '695 Patent at the time or shortly after it was issued, and that Speed is aware its conduct — manufacturing and selling clutches using Tapp's design — is covered by the claims of the '695 Patent. (Compl. (Doc. 1) ¶¶ 62–63.) Tapp avers that Speed has been infringing, and continues to infringe, the '695 Patent since it was issued on October 1, 2024, and that Tapp has not accepted any payments from Speed after the issue date. (Id. ¶¶ 60, 67.)

## II.  **PROCEDURAL HISTORY**

Tapp filed its complaint on November 13, 2024. (Id. at 22–29.) On December 18, 2024, Tapp filed a Motion for Preliminary Injunction, (Pl.'s Mot. for Prelim. Inj. (Doc. 8)), seeking an interim remedy for patent infringement. Tapp also filed a brief in support of its motion, (Mem. of Law in Supp. of Mot. for Prelim. Inj. ("Pl.'s Br.") (Doc. 9)), on the same day. Speed responded to Tapp's motion, (Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Prelim. Inj. ("Def.'s Resp.") (Doc. 12)), on January 29, 2025, and Tapp replied, (Reply to Defs.' Opp'n to

- 7 -

Pl.'s Mot. for Prelim. Inj. ("Pl.'s Reply") (Doc. 13)), on February 12, 2025.

A hearing on the motion for preliminary injunction was held before this court on October 31, 2025. (Docket Entry 10/31/25.) The parties were given the opportunity to submit supplemental briefing following the hearing. (Id.) Both parties submitted supplemental briefs on November 7, 2025. (Def.'s Supp. Br. (Doc. 27); Pl.'s Supp. Br. (Doc. 28).) The motion is now ripe for ruling.

## III. **STANDARD OF REVIEW**

Pursuant to 35 U.S.C. § 283, this court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. The purpose of a preliminary injunction "is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 525 (4th Cir. 2003). "In the patent context, a preliminary injunction has a similarly conservatory function." MicroAire Surgical Instruments, LLC v. Arthrex, Inc., 726 F. Supp. 2d 604, 615 (W.D. Va. 2010) (citing

Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1344-45 (Fed. Cir. 2008)).

To obtain a preliminary injunction, a plaintiff must establish four prongs: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "Courts considering whether to impose preliminary injunctions must separately consider each Winter factor." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017). A preliminary injunction "is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit," and the moving party bears the burden of "clearly establish[ing] entitlement to the relief sought." Id.

## IV. ANALYSIS

### A. Likelihood of Success on the Merits

Tapp's motion for preliminary injunction is premised on its allegations of ongoing infringement of the '695 patent by Speed. (Pl.'s Mot. for Prelim. Inj. (Doc. 8); Pl.'s Br. (Doc. 9) at 4; see also Compl. (Doc. 1) ¶¶ 81, 82-89.) In a patent infringement case, "[t]o show likelihood of success on the merits a patentee must show '(1) it will likely prove infringement and (2) its

- 9 -

infringement claim will likely withstand challenges to the validity and enforceability of the patents.'" <u>Natera, Inc. v. NeoGenomics Lab'ys, Inc.</u>, 106 F.4th 1369, 1375 (Fed. Cir. 2024); <u>United Therapeutics Corp. v. Liquidia Tech., Inc.</u>, 1:25-cv-368, 2025 WL 1549896, at *4 (M.D.N.C. May 30, 2025).

### 1.   <u>Likely to Prove Infringement</u>

Tapp's claim of patent infringement is captured by the following allegations: Tapp granted Speed a license to use Tapp's clutch design in the email exchange of November 4, 2020, (Compl. (Doc. 1) ¶ 34); Tapp terminated that license on April 6, 2024, (<u>id.</u> ¶ 57); the '695 patent was issued on October 1, 2024, (<u>id.</u> ¶ 61); and Defendant has continued to use the clutch design since then, (<u>id.</u> ¶ 67). Speed responds with two arguments on this point. First, Speed disputes that its UTV clutch infringes the '695 patent. (Def.'s Resp. (Doc. 12) at 12-14). Second, Speed disputes Tapp's termination of that license. (<u>Id.</u> at 11-12.)

The thrust of Speed's first argument is that Tapp cannot show it is likely to prove infringement because the claim chart that Tapp submitted to support its claim is deficient. (<u>Id.</u> at 12-14.) Tapp's complaint alleges that "[Speed] has infringed and continues to directly infringe upon one or more claims of the '695 Patent, either literally or under the Doctrine of

- 10 -

Equivalents." (Compl. (Doc. 1) ¶ 83.) According to Speed, the claim chart supporting this claim, (Ex. 14 (Doc. 1-14)), "is deficient and misleading and does not demonstrate that Defendant's accused products meet all the limitations of the asserted patent claims." (Def.'s Resp. (Doc. 12) at 13.) However, Speed offers no specific reasons why it is "deficient" and "misleading" beyond asserting that the chart includes images of "[Speed]'s clutch, not [Tapp]'s clutches" to illustrate its claims. (Id. at 14.) Moreover, Speed's CEO Robby Gordon expressly admits that Speed "incorporate[s] the Tapp clutch design into its vehicles" and that "[a]ll of Speed UTV's vehicles utilize the Tapp Clutch design." (Ex. A (Doc. 12-1) ¶¶ 18–19; see also Compl. (Doc. 1) ¶¶ 44–51.) This court therefore concludes that Tapp has sufficiently demonstrated for present purposes that Defendant's clutch infringes the '695 patent. See Centrak, Inc. v. Sonitor Techs., Inc., 915 F.3d 1360, 1371 (Fed. Cir. 2019) ("Infringement is a question of fact. Direct infringement can be found when a defendant makes a product containing each and every limitation set forth in a claim." (internal quotation marks and citations omitted)); Microsoft Corp. v. GeoTag, Inc., 817 F.3d 1305, 1313 (Fed. Cir. 2016) ("Under the doctrine of equivalents, infringement occurs where there is equivalence between the elements of the accused product

and the claimed elements of the patented invention." (cleaned up)).

In its second argument on this point, Speed agrees with Tapp that "the parties entered into a licensing agreement, whereby [Speed] obtained the right to use [Tapp's] clutch designs," but it disputes Tapp's termination of that license. (Def.'s Resp. (Doc. 12) at 11–12.) Speed argues that Tapp could not or did not terminate the license, and, therefore, Speed retains the license to use Tapp's patented clutch design. (Id. at 12.) In other words, the parties disagree as to whether the license included termination and notice terms and, if so, whether Tapp complied with them.

Accordingly, this court must determine the nature and terms of the license Tapp granted Speed, if one exists. "A patent grants its owner the right to exclude others from making, using or selling the patented invention. However, all or part of the right to exclude may be waived by granting a license, which may be express or implied." Carborundum Co. v. Molten Metal Equip. Innovations, Inc., 72 F.3d 872, 878 (Fed. Cir. 1995) (citation omitted); see also Silicon Graphics, Inc. v. ATI Techs., Inc., 607 F.3d 784, 793 (Fed. Cir. 2010) ("[L]icensed use of a product does not constitute direct infringement and, therefore, does not

support a finding of indirect infringement." (internal quotation marks omitted) (emphasis in original)).

North Carolina contract law controls the issues of formation and construction of any license granted by Tapp to Speed. See State Contracting & Eng'g Corp. v. Florida, 258 F.3d 1329, 1339 (Fed. Cir. 2001) ("Whether express or implied, a license is a contract governed by ordinary principles of state contract law.") (internal quotation marks omitted) (quoting McCoy v. Mitsuboshi Cutlery, Inc., 67 F.3d 917, 920 (Fed. Cir. 1995)).[5] Under North Carolina law, the essential elements of a valid contract are "offer, acceptance, consideration, and mutuality of assent to the contract's essential terms." Se. Caissons, LLC v. Choate Const. Co., 247 N.C. App. 104, 110, 784 S.E.2d 650, 654 (2016); see also Lannan v. Bd. of Governors of Univ. of N.C., 387 N.C. 239, 250, 913 S.E.2d 163, 171 (2025). "To serve as the foundation for a valid contract, the offer must

_____

[5] Neither party raises a choice of law issue, therefore, this court applies the substantive law of North Carolina. Wiener v. AXA Equitable Life Ins. Co., 58 F.4th 774, 782 (4th Cir. 2023) ("Where neither party argues that the forum state's choice of law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law." (internal quotation marks and citation omitted)). Further, this court applies North Carolina common law because "granting a license under a patent or copyright" is one of the "[m]any commercial transactions [that] are not governed by Article 2 of the UCC." Novamedix, Ltd. v. NDM Acquisition Corp., 166 F.3d 1177, 1182 (Fed. Cir. 1999).

- 13 -

be intended to create legal obligations if accepted." Lannan, 387 N.C. at 250, 913 S.E.2d at 171. "Acceptance occurs only if the parties 'assent to the same thing in the same sense, . . . and their minds must meet as to all the terms.'" Id. (citation omitted). The agreement "must not be . . . intended merely to open negotiations which will ultimately result in a contract . . . ." Id. (quotation marks and citation omitted). "Whether mutual assent is established and whether a contract was intended between parties are questions for the trier of fact." Snyder v. Freeman, 300 N.C. 204, 217, 266 S.E.2d 593, 602 (1980).

Both Tapp and Speed contend that an express license existed at some point during their business relationship. (See Pl.'s Br. (Doc. 9) at 12; Def.'s Resp. (Doc. 12) at 11.) This court finds otherwise. The facts now before this court on a preliminary basis show that the parties engaged in discussions and negotiations over the terms of a possible licensing agreement but that they never managed to agree to the same terms.

Take the November 4 email exchange, (Ex. 5 (Doc. 1-5)), which Tapp now contends constituted an express license, (Compl. (Doc. 1) ¶ 35; Pl.'s Supp. Br. (Doc. 28) at 2). The exchange begins with an email from Tapp's representative to Gordon, Speed's CEO, providing a bullet-pointed list of terms, which the

- 14 -

prefatory and concluding language of the email suggests is intended as an offer. (See Ex. 5 (Doc. 1-5) at 2.) The email begins by characterizing the list as "an interim and/or supplemental agreement until we have the agreements drafted by our lawyers in place," and it closes out the list with the request "[i]f you are comfortable with the aforementioned, please let me know by responding to this email," followed by the anticipatory sign-off "[t]hank you in advance." (Id.) However, the immediate lead-in to the bullet-pointed list adds a dash of ambiguity: "Based on our conversation today . . . we have agreed to the following[.]" (Id.) This language suggests that the list could be understood as a memorialization of terms hammered out in a prior round of negotiation, rather than an offer of a complete agreement seeking acceptance. (See id.)

Gordon's response nine minutes later suggests he understood the first email and the terms therein as an offer seeking his acceptance. He responded — note the present tense verb — "We agree with the terms listed[.]" (Id. (emphasis added).) However, this apparent acceptance is modulated by the sentence that immediately follows it: "We also discussed a 5 year Agreement with similar terms on renewal[.]" (Id.) Thus, construing the first email as an offer, Gordon's response did not simply accept that offer as-is; rather, the response added a term that does

- 15 -

not appear in the bullet-pointed list. (See id.) Then, thirty-six minutes later and in the final email of the exchange, Tapp's representative replied without addressing or even acknowledging the additional term: "Thank you Robby. You have been a real pleasure to work with and we look forward to enjoying a long and mutually beneficial relationship." (Id. at 3.) However, if the first email is construed as a memorialization of prior negotiations rather than an offer, Gordon's response can be understood as generally confirming the accuracy of the memorialization but noting the omission of the additional terms. (See id.)

According to this court's reading, no contract — that is, no express license — was formed by the November 4 email exchange. At best, the first email from Tapp's representative constituted an offer that was subsequently rejected by Gordon's response, which purported to accept but added a new term. "If the terms of the offer are changed or any new ones added by the acceptance, there is no meeting of the minds and, consequently, no contract. This counteroffer amounts to a rejection of the original offer." Normile v. Miller, 313 N.C. 98, 103, 326 S.E.2d 11, 15 (1985) (internal quotation marks and citation omitted). In other words, Gordon's response constituted a rejection and counteroffer that Tapp was free to accept or reject. See id.;

see also Ferguson v. Phillips, 268 N.C. 353, 355, 150 S.E.2d 518, 521 (1966) ("If the acceptance contains material conditions not included in the offer, such purported acceptance constitutes a counter proposal which the other party is not bound to accept." (internal quotation marks and citation omitted)). But the reply email from Tapp's representative did not accept Gordon's counteroffer; it was not an "unequivocal" manifestation of Tapp's intent to be bound by the terms of Gordon's counteroffer. See Standard Sand & Gravel Corp. v. McClay, 191 N.C. 313, 313, 131 S.E. 754, 755 (1926) ("[I]n order to constitute a binding contract the offer and acceptance must be in identical terms and unequivocal." (emphasis added)); Exec. Leasing Assocs. v. Rowland, 30 N.C. App. 590, 592, 227 S.E.2d 642, 644 (1976) ("An acceptance . . . manifests the offeree's intent to be bound by the terms of the offer."). Then, even as the parties' collaboration progressed, they continued to negotiate the terms of the license, exchanging drafts without ever reaching agreement upon one. (See Compl. (Doc. 1) ¶¶ 38-40; Ex. 33 (Doc. 1-33); Answer (Doc. 15) ¶¶ 38-40.)

This court is not convinced, however, that the first email of the November 4 email exchange even constituted a definite, present offer of a license. The email expressly anticipated a future contract (or contracts) between the parties, with Tapp's

representative asserting that the parties should rely on the
listed terms only "until we have the agreements drafted by our
lawyers in place." (See Ex. 5 (Doc. 1-5) at 2.) Moreover, the
relevant terms presented in that email suggest that the
anticipated future contract, rather than the present email
exchange, would create and govern the license. (See id.) Each of
those two terms read in relevant part: "Speed will enter into a
licensing agreement to pay TAPP a royalty amount . . . ." (Id.
(emphasis added).) The use of that future tense verb — "will
enter" — signifies the intent to enter into a license agreement
in the future, through the anticipated "agreements drafted by
our lawyers", (id.), rather than at the present time, through
the immediate exchange of emails. See Parker v. Glosson, 182
N.C. App. 229, 232, 641 S.E.2d 735, 736 (2007) ("[W]hen
negotiating parties make clear that they do not intend to be
bound by a contract until a formal written agreement is
executed, no contract exists until that time.")

    In other words, what the parties see as a contract or
express license appears to this court to be only an agreement to
agree. In fact, it is less than that — it was an unconsummated
offer to agree, as the parties never managed to match an
acceptance to the offer. The reasoning of the North Carolina
Court of Appeals in Garland v. Orange County supports this

conclusion. <u>See</u> 293 N.C. App. 232, 238-39, 900 S.E.2d 689, 694-95. There, the court held a purported settlement agreement unenforceable "because there was no settlement agreement." <u>Id.</u> at 238, 900 S.E.2d at 694. Applying "established rules relating to contracts," the court reviewed the course of negotiations between the parties. <u>Id.</u> The court began with an email sent "'to memorialize the terms of the parties' settlement reached at today's settlement conference' and promising to draft a settlement agreement to circulate 'for review and signature[.]'" <u>Id.</u> at 239, 900 S.E.2d at 694-95. The court held the email was merely an agreement to agree "because the email contemplates a future agreement for signature." <u>Id.</u> at 239, 900 S.E.2d at 695. Then, turning to the parties' subsequent exchange of draft settlement agreements, the court found no mutual assent or meetings of the minds:

> [D]efendant's counsel sent plaintiff's attorney a proposed settlement agreement that required the parties' signatures. [Then], plaintiff's attorney sent an email with changes to the proposed settlement agreement, effectively rejecting defendant's offer and proposing a new agreement. [Next,] [d]efendant's counsel communicated that defendant required plaintiff to execute the agreement it drafted by [a specified date], and plaintiff did not accept the settlement offer by that date; thus, the offer was withdrawn.

> [Finally,] defendant's attorney renewed their initial offer . . . . [But] plaintiff's counsel sent additional changes to defendant's proposed settlement agreement, again rejecting defendant's offer and proposing a new agreement. Plaintiff's counsel later sent an email . . .

- 19 -

> agreeing to defendant's initial draft, but because
> plaintiff had rejected defendant's offer and
> counteroffered with revision to the agreement, this
> action did not constitute an acceptance.

Id. at 239–40, 900 S.E.2d at 695. Thus, the court determined that neither the email nor the subsequent exchange of draft agreements were sufficient to support the formation of a contract. Id. at 240, 900 S.E.2d at 695.

The facts of the instant case — at least, as the court preliminarily finds them for the purposes of the present motion — bear a remarkable resemblance to those of Garland. Here, Tapp's email initiating the November 4 email exchange expressly contemplates a "future agreement for signature" that will grant and govern the license from Tapp to Speed. See id. at 239, 900 S.E.2d at 695; (Ex. 5 (Doc. 1-5) at 2). As such, the email is "at best an agreement to agree." See Garland, 293 N.C. App. at 239, 900 S.E.2d at 695. But even if it were a sufficiently definite, present offer, Gordon's response constituted a rejection and counteroffer, to which, in turn, Tapp did not agree. (See Ex. 5 (Doc. 1-5) at 2-3); see also Garland, 293 N.C. App. at 239–40, 900 S.E.2d at 265. Thus, no express license arose from the November 4 email exchange. Nor did the parties subsequent exchange of draft license agreements result in a binding express license. Like Garland, the parties "exchanged several drafts" of the agreement, but each draft sent by one

- 20 -

party to the other worked a modification of the proposed terms, thereby rejecting the prior iteration of the proposed terms. (See Compl. (Doc. 1) ¶¶ 38-40; Answer (Doc. 15) ¶¶ 38-40; Ex. 33 (Doc. 1-33)); Garland, 293 N.C. App. at 239-40, 900 S.E.2d at 265. In the end, Tapp and Speed failed to agree to any proposed license agreement. (See Compl. (Doc. 1) ¶ 40; Answer (Doc. 15) ¶ 40.) Thus, no express license arose from their exchange of drafts. See Garland, 293 N.C. App. at 239-40, 900 S.E.2d at 265.

The analysis does not end there, however. Although this court finds that no express license was created by the parties, it is still possible that they formed an implied license. Like an express license, "[a]n implied license signifies a patentee's waiver of the statutory right to exclude others from making, using, selling, offering to sell, or importing, the patented invention." Winbond Elecs. Corp. v. Int'l Trade Comm'n, 262 F.3d 1363, 1374 (Fed. Cir. 2001). "In most instances under contract law, a patent or trademark owner intentionally creates an express license. . . . In some circumstances, however, the entire course of conduct between a patent or trademark owner and an accused infringer may create an implied license." McCoy, 67 F.3d at 920. In De Forest Radio Telephone & Telegraph Company v. United States, the Supreme Court described the formation of an implied license:

- 21 -

> Any language used by the owner of the patent or any
> conduct on his part exhibited to another, from which
> that other may properly infer that the owner consents to
> his use of the patent in making or using it, or selling
> it, upon which the other acts, constitutes a license,
> and a defense to an action for a tort.

273 U.S. 236, 241 (1927); see also Wang Labs., Inc. v.

Mitsubishi Elecs. Am., Inc., 103 F.3d 1571, 1580 (Fed. Cir.

1997). Since De Forest, courts and scholars have sought to

categorize how implied licenses arise — "by acquiescence, by

conduct, by equitable estoppel (in pais), or by legal estoppel,"

for example — but "[t]hese labels describe not different kinds

of licenses, but rather different categories of conduct which

lead to the same conclusion: an implied license." Wang Labs.,

103 F.3d at 1580.

The facts of De Forest prove useful here in discerning

whether the "entire course of conduct" between Tapp and Speed

created an implied license. At issue in De Forest was whether

the American Telephone & Telegraph Company ("AT&T") granted the

United States an implied license to use "certain patented vacuum

tubes or audions used in radio communications." De Forest, 273

U.S. at 237, 242. The United States, engaged in World War I at

the time, had informed AT&T that it planned to "have large

numbers of the audions made promptly for it by the General

Electric Company" ("GE") for use in the war. Id. at 239. AT&T

responded that it would not "interfere with the immediate

- 22 -

manufacture of the audions" but asserted that it was not waiving any of its patent rights or claims by doing so. Id. AT&T then "furnished information, drawings, and blueprints to [GE], and permitted representatives and experts of the United States and [GE] to witness and study the manufacture of said audions by [AT&T.]" Id.

Examining these circumstances, the Supreme Court reasoned that the combination of AT&T's statement with its subsequent acts to assist the United States to manufacture the audions, "made such conduct clearly a consent to their manufacture and use, and a license." Id. at 241. In other words, the Court held these "circumstances show clearly that what the company was doing was not only fully consenting to the making and using by the United States of the patent, but was aiding such making and using, and in doing so was licensing it." Id. at 242.

In the present case, neither party disputes that Tapp granted Speed a license to use the clutch design covered by the '695 patent. Despite the absence of an express license, the entire course of conduct between Tapp and Speed suggests the existence of an implied license. Tapp communicated to Speed its intent to license the clutch design and indicated that the scope of such a license would encompass Speed's use, manufacture, and sale of clutches. (See Ex. 5 (Doc. 1-5); Ex. 7 (Doc. 1-7); Ex.

- 23 -

33 (Doc. 1-33); see also Compl. (Doc. 1) ¶¶ 30-37.) In October
2020, Forsyth personally delivered Speed a Tapp prototype clutch
for installation in Speed's prototype UTV — and went to
considerable effort to do so. (See Compl. (Doc. 1) at ¶¶ 30-32;
Ex. 7 (Doc. 1-7); Ex. 5 (Doc. 1-5); Answer (Doc. 15) ¶¶ 30, 33.)
Tapp then worked to modify the prototype clutch "to make it
compatible with the prototype of [Speed's UTV]." (Compl. (Doc.
1) ¶ 41; Answer (Doc. 15) ¶ 41; see Exs. 24-28 (Docs. 1-24, 1-
25, 1-26, 1-27, 1-28).) Tapp also created a "robust set of
technical drawings" of the prototype clutch in anticipation of
having the prototype "machined by a third party and reproduced
on a large scale to accommodate [Speed's] anticipated demand."
(Compl. (Doc. 1) ¶ 32.) Tapp sold the modified prototype to
Speed in December 2020. (See id. ¶ 37; Exs. 30-31 (Docs. 1-30,
1-31); Ex. 5 (Doc. 1-5) at 2 ("Upon receipt of the
aforementioned $30,000US wire transfer, Robby Gordon will take
possession of the secondary clutch prototype . . . .").)
Finally, despite the failure to agree to a "formal" licensing
agreement, Tapp was aware that, beginning in 2023, Speed began
manufacturing and selling to consumers the Tapp-designed clutch
as part of Speed's UTVs or as a replacement part. (See Compl.
(Doc. 1) ¶¶ 42-56; see also Exs. 9, 12 (Docs. 1-9, 1-12).) In
fact, Tapp accepted "periodic payments" from Speed in 2024,

- 24 -

(Compl. (Doc. 1) ¶ 53; see Ex. 12 (Doc. 1-12) at 1), and Forsyth helped Speed troubleshoot technical issues in April of that year, (see Compl. (Doc. 1) ¶ 54; Ex. 12 (Doc. 1-12) at 9; Ex. 18 (Doc. 1-18) at 2; Ex. 20 (Doc. 1-20)).

Thus, the "entire course of conduct" here resembles that in De Forest. Not only did Tapp's expressions and conduct communicate to Speed that it would not immediately prevent Speed's use or manufacture of the Tapp-designed clutch, but Tapp conduct showed it "was aiding such making and using, and in doing so was licensing it." See De Forest, 273 U.S. at 241–42; see also Radar Indus. Inc. v. Cleveland Die & Mfg. Co., 424 F. App'x 931, 933–34 (Fed. Cir. 2011). Consistent with the holding of De Forest, this court finds here that Tapp granted Speed an implied license to use the clutch design covered by the '695 patent.

In so finding, this court must next determine the scope of the implied license between Tapp and Speed. See Carborundum, 72 F.3d at 878 ("Our inquiry does not end, however, once we determine that a license should be implied. We must further look to the circumstances of the sale to determine the scope of the implied license."). The scope and duration of an implied license depends on the particular facts of the case. See id. (citing Edison Elec. Light Co. v. Peninsular Light, Power & Heat Co.,

- 25 -

101 F. 831, 836 (6th Cir. 1900) ("It is evident that the extent of an implied license must depend on the peculiar facts of each case.")). The determination is "based on what the parties reasonably intended as to the scope of the implied license based on the circumstances." Id.

For the present motion, most important is the extent to which the implied license was freely terminable and whether it has been terminated. With respect to terminability, this court finds significant Tapp's rejections of Speed's requests for durational and renewal terms during the parties' negotiations over an express license agreement. (See Compl. (Doc. 1) ¶¶ 38-40; Ex. 5 (Doc. 1-5); Ex. 33 (Doc. 1-33).) While the parties failed to form an express license, Tapp's rejections suggest an intent that any license between the parties be unencumbered by durational or renewal terms, and Speed's attempts to insert those terms into the draft agreements suggest their understanding that, without such terms, any license between the parties was likely freely terminable. (See id.)

With respect to whether the license was in fact terminated, Tapp argues that it terminated any license that existed as of April 6, 2024, through its letter on March 6, 2024. (Compl. (Doc. 1) ¶¶ 56-57; Pl.'s Supp. Br. (Doc. 28) at 6.) However, it is not clear to this court that Tapp's March 6 letter indicates

- 26 -

a desire to terminate any license or relationship, especially considering that Forsyth visited Speed in Arizona "on or around March 28, 2024 to help diagnose and remedy the mechanical issues" that Speed's vehicles were allegedly facing. (Pl.'s Br. (Doc. 9) at 16; see Ex. 13 (Doc. 1-13).) What is clear is that any implied license ended on November 13, 2024, when Tapp filed its complaint accusing Speed of infringing its patent. See KPR U.S., LLC v. LifeSync Corp., No. 22-CV-60468-RAR, 2023 WL 5529176, at *11 (S.D. Fla. Aug. 27, 2023) ("Once the patentee takes affirmative steps to protect its patent, the infringer cannot reasonably believe that it has a license to use the patent thereafter . . . ."); see also Chemagro Corp. v. Universal Chem. Co., 244 F. Supp. 486, 490 (E.D. Tex. 1965) ("A patent license through acquiescence may be terminated by subsequent conduct of the patent owner or a licensee thereof, such as by the institution of an action for infringement of said patent, since acquiescence in known infringements does not authorize their continuance.").

Accordingly, for the reasons discussed above, this court finds that an implied license to practice the '695 patent arose between Tapp and Speed, and Tapp had the power to and did in fact terminate said license at least upon filing this lawsuit on

- 27 -

November 13, 2024. Therefore, this court finds that Tapp will likely prove infringement of the '695 patent by Speed.

### 2. <u>Validity and Enforceability</u>

In addition to showing that "it will likely prove infringement," Tapp must show "its infringement claim will likely withstand challenges to validity and enforceability" of the '695 patent in order to establish "likelihood of success on the merits." <u>Natera</u>, 106 F.4th at 1375. A patent is presumed valid. <u>Purdue Pharma L.P. v. Boehringer Ingelheim GMBH</u>, 237 F.3d 1359, 1365 (Fed. Cir. 2001); <u>KSR Int'l Co. v. Teleflex, Inc.</u>, 550 U.S. 398, 412 (2007) ("By direction of 35 U.S.C. § 282, an issued patent is presumed valid."). The party challenging the validity of a patent must come forward with evidence that raises a substantial question of validity. <u>Titan Tire Corp. v. Case New Holland, Inc.</u>, 566 F.3d 1372, 1376 (Fed. Cir. 2009). If that burden is satisfied, patentee then has the "burden of responding with contrary evidence." <u>Id.</u> at 1377. If the patentee does not prove the validity question "lacks substantial merit," courts will deny the motion for a preliminary injunction. <u>Amazon.com, Inc. v. Barnesandnoble.com, Inc.</u>, 239 F.3d 1343, 1350-51 (Fed. Cir. 2001).

Here, Speed argues that "substantial questions exist as to the validity of the '695 patent." (Def.'s Resp. (Doc. 12) at

- 28 -

10.) Speed offers two arguments as to why there is a substantial question of invalidity. First, Speed contends that it "has identified several prior art patents and other prior art references that were not considered during the examination of the '695 patent."[6] (Def.'s Resp. (Doc. 12) at 15.) Speed submits evidence of the '544 Berto patent, (Ex. C (Doc. 12-3)), the '330 Galleher patent, (Ex. D (Doc. 12-4)), and the '994 Beyer patent, (Ex. F (Doc. 12-5)), as well as a Youtube video "illustrat[ing] an arrangement similar to" the '944 patent, (Ex. 6 (Doc. 12-6) at 3).[7] Speed contends that there are a number of similarities between this prior art and Tapp's '695 clutch and argues that the prior art invalidates Claims 1, 2, 3, 4, 6, and 7 of Speed's '695 patent.[8] (See Def.'s Resp. (Doc. 12) at 15-16; see also Ex.

---

[6] Tapp avers that the USPTO Examiner "considered fifty prior art references" when examining Plaintiff's '695 patent application. (See Pl.'s Reply (Doc. 13) at 12 n.6 (citing Ex. 1 (Doc. 1-1) at 3).)

[7] Speed's CEO, Gordon, also asserts in his declaration that "the Tapp clutch [is] a copy of a clutch known as the Polar Vortex clutch produced by a company called Half Scale Dragsters, Incorporated." (Ex. A (Doc. 12-1) at 3, ¶ 5.) But this appears to be a bare assertion for which Speed fails to adduce supporting evidence.

[8] Tapp argues that Speed's failure to allege that prior art invalidates Plaintiff's Claims 5 and 8, means that at least these two claims are "presumed valid" and that Defendant's challenge fails. (Pl.'s Reply (Doc. 13) at 13); see also Apple Computer, Inc. v. Articulate Sys., Inc., 234 F.3d 14, 24 (Fed. Cir. 2000) ("[E]ach claim of a patent is 'presumed valid independently of . . . the other claims' and 'dependent . . . claims shall be presumed valid even though dependent upon an invalid claim.'" (citation omitted)).

C (Doc. 12-3) at 28–36; Ex. D (Doc. 12-4) at 17–25; Ex. E (Doc. 12-5) at 14–23; Ex. F (Doc. 12-6).) Tapp counters by identifying various unique aspects of its '695 clutch missing from the prior art that Speed cites. (See Ex. F (Doc. 13-6).)

Based on this evidence, it appears likely that Speed has successfully shown that many of the elements of the '695 clutch were "known in the prior art." See ProBatter Sports, LLC v. Sports Tutor, Inc., 680 F. App'x 972, 976 (Fed. Cir. 2017). However, "[t]he law is clear that 'a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art.'" Id. (quoting KSR Int'l Co., 550 U.S. at 418). To show that the '695 patent is invalid for obviousness, Speed must articulate a "reason why a skilled artisan would have made the combination" that Tapp made when it designed the clutch claimed by its '695 patent. See Natera, Inc., 106 F.4th at 1376–77. Speed fails to do so. Accordingly, this court finds Tapp "has shown it is more likely than not to prevail over [the] invalidity challenge." Id. at 1376.

Second, Speed contends that Forsyth, Tapp's founder and CEO and inventor of the '695 patent, had been selling clutches for years and "did not disclose any of his own prior art clutches (or other clutches he might have been aware of at that time) to

the USPTO for its consideration in connection with his application." (Def.'s Resp. (Doc. 12) at 16 (emphasis added).) The only evidence Speed submits in support of this position is the declaration of its own COO and co-founder, Todd Romano, who states that he

> believe[s] that many clutches that have been sold for years, possibly as early as 2010, including clutches sold by Plaintiff and its principal Mr. Forsyth, include all the features that are set forth in Claims 1 and 3-8, with only a few possible exceptions for features that were contributed by Speed UTV, as described in Robby Gordon's Declaration.

(See Ex. G (Doc. 12-7) at 3.) Defendant offers no further supporting documentation to substantiate the "belief" of its COO. "The relevant inquiry" here, again, is "whether [Tapp] has shown it is more likely than not to prevail over an invalidity challenge." See Natera, Inc., 106 F.4th at 1376–77. Accordingly, this court finds that Speed's assertion that Tapp's own prior art invalidates its '695 patent is insufficiently supported and of no impact on the analysis of whether the '695 patent is valid and enforceable.

## B. **Irreparable Harm**

In addition to a likelihood of success on the merits, a plaintiff seeking a preliminary injunction must also "make a clear showing that it is likely to be irreparably harmed absent preliminary relief." Real Truth About Obama, Inc. v. FEC, 575

- 31 -

F.3d 342, 347 (4th Cir. 2009), <u>vacated on other grounds</u> 559 U.S. 1089 (2010). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." <u>Sampson v. Murray</u>, 415 U.S. 61, 90 (1974) (internal quotation marks omitted) (quoting <u>Va. Petrol. Jobbers Ass'n v. Fed. Power Comm'n</u>, 259 F.2d 921, 925 (D.C. Cir. 1958)).

Here, Tapp contends that it will suffer irreparable harm absent preliminary injunctive relief because it will lose market share to Speed "in a two-player market." (Pl.'s Br. (Doc. 9) at 21–23.)[9] Specifically, Tapp contends that Tapp and Speed "are the only two entities that manufacture clutches that practice the '695 Patent, including those that would be used as replacement, spare or as warranty parts in [Speed]'s Vehicles." (<u>Id.</u> at 21.)

"[T]he existence of a two-player market may well serve as a substantial ground for granting an injunction — e.g., because it creates an inference that an infringing sale amounts to a lost

---

[9] Plaintiff also argues that it will be irreparably harmed due to loss of reputation and goodwill, as well as lost business opportunities. (Pl.'s Br. (Doc. 9) at 23–28.) This court does not find these arguments persuasive because Plaintiff has not made a sufficient showing that the allegedly infringing actions of Defendant are linked to either of these harms.

sale for the patentee." Robert Bosch LLC v. Pylon Mfg. Corp.,

659 F.3d 1142, 1151 (Fed. Cir. 2011) (emphasis omitted). In

Robert Bosch LLC,

> the district court committed a clear error in judgment
> when it concluded that Bosch failed to demonstrate
> irreparable harm. The record [t]here contain[ed]
> undisputed evidence of direct competition in each of the
> market segments identified by the parties. Bosch also
> introduced unrebutted evidence of loss of market share
> and access to potential customers, as well as Pylon's
> inability to satisfy a judgment.

Id. at 1152. "While the party seeking an injunction bears the

burden of showing lost market share . . . Bosch made a prima

facie showing of lost market share, and Pylon proffered no

evidence to rebut that showing." Id. at 1154.

Speed argues that Tapp is not losing any market-share

because Speed "does not sell the clutches it manufactures apart

from use in its own vehicles," and Tapp does not manufacture or

sell UTV vehicles. (Def.'s Resp. (Doc. 12) at 17–18.)[10] However,

Tapp adduces two invoices that appear to show that Speed sells

clutches as individual replacement units, separate and apart

---

[10] Tapp responds that "every sale by [Speed] — including
those admittedly installed on its own Vehicles — is a lost sale
by TAPP." (Pl.'s Reply (Doc. 13) at 11.) This argument is not
persuasive. Plaintiff does not sell UTV vehicles, so any UTV
sold by Defendant (even if that UTV incorporates Plaintiff's
clutch design) does not cause Plaintiff to lose shares in a
market in which it competes. If Plaintiff succeeds on the merits
of its patent infringement claim, it can collect damages from
Defendant for Defendant's use of the clutch design in the UTV
vehicles that it sells. That alleged harm is not irreparable.

- 33 -

from its UTV vehicles. (See Exs. G-H (Docs. 13-7, 13-8).)
Although Tapp's evidence of Speed's individual sales of clutches
is thin, this court finds that it is just enough for a prima
facie showing that Tapp and Speed compete in a two-player market
to sell the clutches as replacement parts and, therefore, every
infringing sale made by Speed of a replacement clutch is a lost
sale for Tapp. See Robert Bosch LLC, 659 F.3d at 1151. Moreover,
the only evidence that Speed cites to rebut Tapp's argument is
Gordon's declaration that "Tapp produces clutches in low volumes
from a machine shop, not a mass production facility." (See
Def.'s Resp. (Doc. 12) at 18 (citing Ex. A (Doc. 12-1) ¶ 20h).)

Tapp requests that this court preliminarily enjoin Speed
from continuing to sell the allegedly infringing clutches, each
of which likely results in a lost sale for Tapp. Accordingly,
this court finds Tapp has established a likelihood of
irreparable harm absent injunctive relief.

C.  **Balance of Equities**

The third prong of the preliminary injunction standard
requires that this court determine whether "the balance of
equities tips in [Tapp's] favor." Winter, 555 U.S. at 20. This
requires assessment of the harm Speed will suffer if Tapp's
motion is granted. See Int'l Lab. Mgmt. Corp. v. Perez, No.
1:14CV231, 2014 WL 1668131, at *14 (M.D.N.C. Apr. 25, 2014).

- 34 -

Tapp argues that Speed is a willful infringer and "[i]t is axiomatic that an infringer . . . cannot complain about the loss of ability to offer its infringing product." (Pl.'s Br. (Doc. 9) at 28); see LEGO A/S v. ZURU Inc., 799 F. App'x 823, 832 (Fed. Cir. 2020). Speed responds that the balance of equities should tip in its favor because, although Speed has begun to find a replacement clutch, an injunction "would still be detrimental, putting at risk [Speed]'s supply chain, including at least existing orders for vehicles with the current clutch design and [Speed]'s ability to service and replace clutches in its vehicles that have already been sold and delivered." (Def.'s Supp. Br. (Doc. 27) at 11).

This court finds that the balance of equities weighs in favor of granting Tapp's motion for preliminary injunction. In the absence of an injunction, Tapp is unable to enforce the legal rights it possesses under the patent, and it would "face substantial hardship in being forced 'to compete against its own patented invention.'" See Metalcraft of Mayville, Inc. v. The Toro Co., 848 F.3d 1358, 1369 (Fed. Cir. 2017); see also Robert Bosch, 659 F.3d at 1156. While Speed may suffer some costs from unsold inventory of Tapp-designed clutches, the record reflects that Speed has already begun using an alternative clutch in its products. (See Ex. 3 (Doc. 28-3).) Speed's website reflects that

- 35 -

this new clutch is available for vehicles currently in production and that it can be installed in older models. (See id.) This court also notes that any potential inequitable harm to Speed will be "secured by the issuance of [a] bond if the ultimate ruling is non-infringement or patent invalidity." See Glaxo Grp. Ltd. v. Apotex, Inc., 64 F. App'x 751, 756 (Fed. Cir. 2003). For these reasons, this court concludes that the balance of equities weighs in Tapp's favor.

D. **Public Interest**

The final prong Tapp must establish is that "an injunction is in the public interest." Winter, 555 U.S. at 20. "[T]he public is best served by enforcing patents that are likely valid and infringed." Abbott Labs. v. Andrx Pharms., Inc., 452 F.3d 1331, 1348 (Fed. Cir. 2006). However, rather than the undoubted public interest in protecting legal rights secured by valid patents, the crux of a trial court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief. See Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1458 (Fed. Cir. 1988). That is, the public's interest in enforcing patent rights must be weighed alongside other aspects of the public interest. ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., 694 F.3d 1312, 1341 (Fed. Cir. 2012).

Here, Tapp argues (1) that "[t]he public has a significant interest in protecting patents from infringement" and (2) that "public interest will be served . . . [because Speed]'s Vehicles pose an on-going threat to public safety." (Pl.'s Br. (Doc. 9) at 29–30.) In response, Speed simply repeats its overarching theory of the case: Tapp deceptively induced Speed to partner and then pulled the rug out from under Speed by terminating the license agreement "in order to pave the way for a better business opportunity." (Def.'s Resp. (Doc. 12) at 21–22.) Speed avers "[t]his is not what the patent system was created to foster." (Id. at 22.)

This court finds the public interest lies with Tapp. Because it is unclear to this court that there was an express license agreement, Speed's argument that Tapp is trying to avoid its obligations under such an agreement is unpersuasive. A preliminary injunction in this case would assure that Tapp can enforce their presumptively valid patent.

### E.   Bond Requirement

Tapp argues that a "minimal bond" is appropriate here because it has "submitted evidence demonstrating Defendant's blatant infringement." (Pl.'s Br. (Doc. 9) at 31.) Speed makes no argument regarding the appropriate bond amount in this case.

The Federal Rules of Civil Procedure provide that no preliminary injunction can be issued unless the party awarded injunctive relief is required to post a bond in a sum that "the court considers proper." Fed. R. Civ. P. 65(c). The purpose of such a bond is to secure "costs and damages sustained" by the enjoined party if a later court deems that party "wrongfully enjoined or restrained." Id. The bond requirement "is mandatory and unambiguous." Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 (4th Cir. 1999). Thus, a district court commits legal error if it fails to require a bond upon issuing preliminary injunctive relief. Id. However, the precise amount of a bond is within the trial court's discretion. Id. "Where the district court determines that the risk of harm [to the enjoined party] is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly. In some circumstances, a nominal bond may suffice." Id. at 421 n.3. The bond can be waived entirely when the defendant would not suffer any harm from the injunction. See Citizens for a Responsible Curriculum v. Montgomery Cnty. Pub. Schs., No. Civ.A. AW-05-1194, 2005 WL 1075634, at *12 (D. Md. May 5, 2005).

Here, because Speed has not cited any specific evidence that would allow this court to quantify the potential harm to it, nor has it provided any estimate of monetary damage it will

- 38 -

suffer because of a preliminary injunction, this court finds that a nominal bond is appropriate. See Neo Gen Screening, Inc. v. TeleChem Intern., Inc., 69 F. App'x 550, 556–57 (3d Cir. 2003) (requiring a nominal bond of $10,000 where a defendant had not demonstrated harm from an injunction); Am. Fed'n of Gov't Emps., AFL–CIO v. Trump, 792 F. Supp. 3d 985, 1006 (N.D. Cal. 2025) ("The Court concludes that a nominal bond is warranted in the amount of $10,000 . . . ."). Accordingly, this court will require Tapp to post a $10,000 bond. However, either party may move to adjust the bond amount while the preliminary injunction remains in effect should either party conclude that a different amount would be appropriate. Lab'y Corp. of Am. Holdings v. Kearns, 84 F. Supp. 3d 447, 466 (M.D.N.C. 2015).

## V.    CONCLUSION

For the foregoing reasons,

**IT IS THEREFORE ORDERED** that Plaintiff Tapp Mfg., Inc.'s Motion for Preliminary Injunction, (Doc. 8), is **GRANTED.**

**IT IS FURTHER ORDERED** that a preliminary injunction issued in this matter, and Defendant Speed UTV, LLC is hereby **ENJOINED AND PROHIBITED** from continuing to make, use, import, sell, or offer primary clutches that allegedly infringe Plaintiff Tapp Mfg., Inc.'s U.S. Patent No. 12,104,695.

- 39 -

**IT IS FURTHER ORDERED** that this preliminary injunction shall remain in effect pending further order of this court.

This order shall become effective at the date and time of filing with the Clerk and upon Plaintiff's posting of a bond in the amount of Ten Thousand Dollars and 00/100 cents ($10,000) with the Clerk.

This the 27th day of January, 2026.

_____
United States District Judge